## F. B. SHAW v. J. B. OSTEEN et al.

Western Section. April 30, 1929.

Petition for Certiorari denied by Supreme Court, March 1, 1930.

Kinney & Wills and A. M. Carlton, all of Brownsville, for plaintiff.

J. R. Bond, of Brownsville, L. L. Fonville and Homer H. Waldrop, both of Jackson, for defendant.

SENTER, J. The original bill in this cause was filed by complainant, F. B. Shaw, against the defendants, J. B. Osteen, T. J. Waldrop, and J. L. Law, to recover on a note for the sum of $5,000 and the accrued interest thereon and attorneys fees provided in the face of the note, given as the last deferred payment in the purchase of a body of timber sold by complainant to the defendants, and to enforce a vendor's lien retained in the contract of sale or deed conveying the same, and for the purpose of having a receiver appointed to take charge of the timber already cut and the lumber sawed and then in possession of the defendants.

The original bill was filed on the 19th day of October, 1926, and at the October term, 1926, and before the answer and cross-bills were filed there was a consent decree entered in the cause for the appointment of a receiver, and in which decree the receiver was instructed to sell all lumber and logs on the mill yard of the defendants and all logs that had been cut in the woods, but with leave to the defendants to saw up all the logs on the mill yard and in the woods, provided this was done within forty-five days from the date of the decree, otherwise the receiver to sell the logs. In this consent decree it was further provided: "That after the debt of complainant, F. B. Shaw, and all the costs of this cause including the receiver's compensation and the attorneys fee of complainants solicitors have been paid, that any balance left of the proceeds of certain logs which Edwards & Lyle claimed were taken from their land and put on the mill yard of Osteen, should be applied to the payment of such claims as said Edwards & Lyle should hereafter show they are entitled to by proper pleadings filed in this cause and proof of same, or by agreement of said parties."

At the succeeding term of the court the defendants filed an answer combined with a cross-bill. The answer denied that the defendants, or either of them, were indebted to the complainant in any amount on the note sued on, but admitted the execution of the note. The defendants alleged in the answer and cross-bill that at the time the timber was purchased from complainant that it was purchased on an acreage basis of $25 per acre, and that the tract of timber was represented to contain 1,000 acres by complainant and his agent; that defendants did not have opportunity to make a full inspection of the timber, or the land lines, but relied upon the representations made by complainant and his agent that there was 1,000 acres of the timber land in the tract, and that a survey of the land subsequently made showed only about 646 acres of timber on the tracts. After the filing of the first cross-bill the defendants were permitted to file an amended and supplemental cross-bill by which defendants set out more in detail their contention on the matter of the timber having been sold by the acre and not in gross, and alleging fraudulent misrepresentation by complainant and his agent in pointing out the lines and in representing the tract to contain 1,000 acres, and further alleging that it was agreed that a survey of the lands and the timber would be made if the defendants decided that there was less than 1,000 acres, and if a survey should show that the timber contained less than 1,000 acres, that deduction would be made for the deficiency at the rate of $25 per acre. The cross-bill further alleged that when they later requested of complainant that a survey be made to ascertain the actual number of acres of timber contained in the tract, that complainant refused to make said survey. It was

further alleged in the amended and supplemental cross-bill, that the defendants had gone to great expense in moving their saw mill onto the tract to cut the timber on the assurance that there was as much as 1,000 acres of timber, and that because of this and other matters set out in the cross-bill, they had sustained damages to the amount of $19,000, and sought by the cross-bill as amended to have the last deferred payment note sued on cancelled and surrendered up and a decree for the balance in their favor. The original complainant filed an answer to the first cross-bill, and objected to the filing of the amended and supplemental cross-bill, and moved a dismissal of the amended and supplemental cross-bill or to have same stricken from the files on the grounds of inconsistent averments appearing upon the face of the supplemental cross-bill. This motion was disallowed, and whereupon the original complainant filed an answer denying each and all of the averments contained in the amended and supplemental cross-bill. A large number of depositions were taken by the respective parties and the cause came on for hearing before the Chancellor on the entire record, including the reports of the receiver.

At the hearing of the cause the Chancellor found and so decreed that the sale was made in gross and not by the acre, but further held that, while the timber deed recited that the tract of timber contained 1,000 acres, more or less, as a fact there were only 713 acres. The Chancellor further found and decreed that no actual fraud was intended or practiced by complainant, but that complainant and defendants believed the lands included within the calls contained, approximately, 1,000 acres, and that there was a deficiency in acreage of 287 acres; that a fair average price per acre for said timber was $25 per acre. The Chancellor further decreed that the cross-complainants are not entitled to any abatement of the purchase price for the first ten per cent of deficiency, but that cross-complainants are entitled to an abatement of the purchase price to the extent of 187 acres, at $25 per acre, amounting to $4,675, and that this should be applied as a credit on the notes sued on, as of the date of the note, and that complainant Shaw is entitled to have and receive of the defendants the balance of said note, together with six per cent interest, and an additional allowance of ten per cent as attorneys fees, amounting to the total sum of $455.50, but this amount to be credited with the sum of $175, which complainant admits is a proper credit to be entered on the note.

The complainant, Shaw, prayed and was granted an appeal from so much of said decree as allowed an abatement for the 187 acres found by the Chancellor to be an excessive deficiency, and taxing the complainant Shaw with a part of the costs, and the defendants and cross-complainants excepted to and prayed an appeal to so much

and such parts of the decree as failed to allow an abatement of the purchase price for the first ten per cent of the deficiency, or 100 acres, at $25 per acre; and to so much and such parts of the decree that taxed the defendant with any part of the costs of the suit; and to so much and such parts of the decree as fails to credit the note sued on with $175 as of the date of payment of said $175; and to so much and such parts of the decree as charges defendants and cross-complainants with the timber on the whole of the tract of land known in the record as the 440 acre tract; and to so much and such parts of the decree against the defendants for the $280.50 or any other amount.

The appeals of both parties have been duly perfected and errors assigned by the respective parties.

We will first take up and dispose of the assignments of error filed by the original complainant, F. B. Shaw.

By the first assignment, it is contended that the Chancellor was in error in allowing the defendants an abatement of 187 acres at $25 per acre, amounting to $4,675, and crediting same on the note sued on as of the date of the note, and taxing complainant with the costs accrued at his instance since the date of the filing of the defendant's cross-bill. By the second assignment it is contended that the Chancellor was in error in finding and decreeing there is a deficiency in acreage of the land in timber of 287 acres; by the third assignment the action of the court in disallowing complainants motion to strike from the files the amended and supplemental cross-bill is challenged. The fourth assignment complains of the action of the court in admitting over the objection of the complainant certain portions of the evidence of T. J. Waldrop, J. L. Law and J. B. Osteen, and by which it is insisted that this evidence was in conflict with the rule with reference to parol evidence being admitted to alter, vary, or change the written provisions of the timber deed or contract.

The first and second assignments of error present practically the same question, and will be considered and disposed of together. The written contract or timber deed described the timber sold to the defendants as follows:

". . . have this day bargained and sold and do by these presents hereby transfer and convey to said J. B. Osteen, T. J. Waldrop, and J. L. Law all of the merchantable timber now on the following described land, except the cypress timber, which is reserved and not sold herein, in the 11th civil district of Haywood county, Tennessee, and the land on which said timber is located and situated is bounded on the north by the lands of Stallings, Heard, and Moses; on the south by the lands of Mitchell; and the cleared and cultivated lands of said F. B.

Shaw, on the east by the lands of Moses and the Noel heirs, and on the west by Pond Creek canal ditch, and supposed to contain about 1,000 acres, more or less.

"To have and to hold said merchantable timber on said land, to them, the said J. B. Osteen, T. J. Waldrop and J. L. Law, their heirs and assigns forever."

The contract further provides for a lien on the timber to secure the deferred payment notes in the following language:

"But a lien is hereby and in the notes expressly retained on said timber to secure and make certain the payment of the said notes for the balance of the purchase money, and it is made a part of the consideration herefor, and the said J. B. Osteen, T. J. Waldrop, and J. L. Law agree that they are not to cut more than one-third in value of said timber, as fixed by said F. B. Shaw, until said second note due is paid, and not to cut more than two-thirds in value of said timber as fixed by said F. B. Shaw until said third and last note is paid, and after said notes are paid they may cut said timber at will."

We also quote further from the timber deed with reference to other details of the contract, because we think it is material for the purpose of showing that the agreement between the parties when reduced to writing, appears to be full and complete:

"It is further agreed that the said F. B. Shaw is to have such of the tops and laps of said timber for use for firewood on his farms and to operate his gin, using such of the same as is not merchantable. The said J. B. Osteen, T. J. Waldrop and J. L. Law are to have five years from this date to cut and move said timber from said land, and to the end that they may do so, the right of ingress and egress to and over said lands is hereby granted and given to them for said length of time, and also the right to build roadways, bridges and tramways for the purpose of cutting and moving said timber, they shall further have the right to build a mill site or mill sites on the northeast corner of what is known as the mill site, same being west of Otter Creek Bridge, said mill site or sites not to occupy more than five acres of land; and it is further agreed that on the expiration of this lease the building or buildings erected or built on said mill site or sites, shall belong to the said F. B. Shaw, the said mill site or sites is granted to the grantees herein for the purpose of manufacturing said timber and getting same ready for market. This contract is drawn in duplicate."

As above stated, a great many depositions were taken by the respective parties to the suit, making a large record. We have read this evidence with painstaking care, but deem it unnecessary to discuss the evidence at length. There is considerable conflict in the

evidence on all controverted questions, but after a careful review of all the evidence and the circumstances surrounding the transaction, we are of the opinion that the Chancellor reached the correct conclusion in finding and holding that this sale of the timber by complainant to the defendants was a sale in gross and not by the acre. Before the purchase of the timber by the defendants, they went onto the land in company with the agent of the complainant, and with a colored man who had been familiar with the land lines of the tract for many years, and spent about five hours riding on horseback over the land, and the corners and many of the lines marked on the trees were pointed out to the defendants. It is very probable that they did not at that time go over the entire body of timber, and especially a portion of the timber lying across the canal containing about forty acres, but they seemed to have been satisfied with the inspection they made. The timber was on two adjoining tracts owned by the complainant. A considerable portion of one of the tracts· was cleared land and in cultivation, and a portion of the other tract had been cleared at the time the defendants made the inspection before buying the timber. There is some evidence in the record to the effect that the defendants, or some of them, expressed their concern about the quantity of the timber rather than the number of acres. There is considerable evidence in the record to warrant a conclusion that there was as much or more timber on the tract. than they expected to find, and it so turned out that the quantity of timber exceeded the estimate. The defendants did not make a cruise of the timber before the purchase. However, they were all more or less experienced as timber men, and especially Osteen, who it appears had had many years experience in buying and working timber, and the other defendants were also experienced timber men. The timber deed does not purport to convey a specific number of acres of timber, but purports to convey all the timber on the lands described in the timber deed. The statement in the timber deed that the tract or tracts was supposed to contain about 1,000 acres, more or less, negatives the idea that it was intended as a sale of the timber by the acre, but clearly shows a sale in gross. It is significant that the defendants began the cutting of this timber soon after its purchase, and continued to cut and work the timber for a period of two years or more without making any complaint that there was a shortage in the acreage. They paid all the notes and all of the purchase price, except the last note, the note sued on, without making any claim for any shortage, or any claim of fraudulent misrepresentations as to timber lines. A few months after the defendants began cutting the timber it appears that timber cutters in their employ got over the line and onto the land of Moses, and cut some of his timber, and when Moses demanded payment of the defendants for the timber

they had cut and moved from his land, which lay immediately north of and adjoining the timber they had purchased from complainant, they settled the matter with Moses, without question, and stated that the encroachment on the timber of Moses was done by their timber cutters, who were in ignorance of the dividing line separating the tracts. They did not make any complaint to the complainant, nor did they claim that the timber cut from the Moses land had been represented to them as having been a part of the timber purchased by them from complainant. In neither of the cross-bills filed by the defendants did they claim that they had objected to the provisions in the timber deed with reference to the description and at first refused to accept the same until they were assured by complainant or his attorney that the sale was by the acre, and that the notes would be so drawn as to show that it was a sale by the acre, and that the tract contained 1,000 acres of timber. This contention was not made in the pleadings, but was made in the course of the taking of depositions, when the defendants testified that they only accepted the deed without an express provision that it was a sale by the acre at the price of $25 per acre, and a grantee that the tract contained 1,000 acres, until Mr. Mann Wills, the attorney for complainant, who they claimed drew the timber deed and the deferred payment notes, assured them that the notes containing a recitation to the effect that they were given for 1,000 acres of timber, would be sufficient and would correct a failure to make a specific provision in the deed, and that it was upon this assurance given them by Mr. Wills that they accepted the deed in the form in which it was drawn. However, we think this explanation is not supported by a preponderance of the evidence. Mr. Wills, according to a preponderance of the evidence, did not draw the timber deed or the note, and was not even in Brownsville at the time the timber contract and notes were drawn and signed. We think it clear that Mr. Carlton, an attorney, associated in the offices with Messrs. Kinney & Wills, drew the timber contract and the notes, and that he did not make the representation attributed to Mr. Wills with reference to the notes correcting any inaccuracy contained in the deed. The defendants are all shown to be men of good character and reputations for truth and veracity, and in reaching the conclusion that the evidence preponderates against their contention, we have given due consideration to the proof of the good character of all of the defendants. Mr. Shaw, as well as his agent, Mr. Chamberlain, are also shown to be men of good character and reputation, but in reaching the conclusion we have reached we have considered all the evidence and all the circumstances surrounding the transaction. Another potent fact contained in the record in support of the contention of complainant is the consent decree entered at the first term of the court after the original bill is filed, and a

few days after the original bill was filed. By this consent decree it would appear that the defendants recognized their full liability on the note sued on, and specifically agreed that the amount of the note and the accrued interest and the attorneys fees as provided in the note would be paid out of the proceeds of the sale of the logs and lumber which went into the hands of the receiver. This consent decree will be further referred to later in the opinion.

Having reached the conclusion that this was a sale of the timber in gross on the lands described in the deed, we come now to consider the question of the abatement made by the Chancellor because of the deficiency being so excessive as to entitle the defendants to relief in a court of equity. The decree of the Chancellor, by which he denies any relief on the first 100 acres deficiency, but allows abatement for all deficiency in excess of ten per cent, proceeds on the theory that where a sale of land or timber is made in gross and not by the acre that a deficiency or shortage in acreage of ten per cent has been generally recognized as not being so great a shortage as to indicate either fraud in fact or fraud in law, and that such a shortage of approximately ten per cent has been generally held to come within the "more or less" clause or provision, and for which the grantee would not be entitled to a recovery. This holding by the Chancellor is unique, in that it seeks to meet the equities between the parties. The reasoning of the learned Chancellor proceeds upon the theory that in the absence of wilful fraud or actual fraud that no relief would be granted in a court of equity where the deficiency or shortage is only about ten per cent, when the sale is one in gross and not by the acre, and that such a deficiency is allowable, and that a grantee could not recover or be entitled to an abatement for that percentage of shortage in acreage, and that the grantee would not be entitled to recover for that shortage in acreage in excess of about ten per cent usually allowed, and it was upon this theory that the Chancellor held that for the first ten per cent of shortage, the defendants would not be entitled to any recovery or to any abatement on the purchase price, but would be entitled to recover for all deficiency in acreage in excess of ten per cent. While this would appear to meet the equities, we have found no precedent to support this holding by the Chancellor. We are of the opinion that the fallacy of this reasoning and holding by the learned Chancellor is to be found in the reason for the rule adopted in most jurisdictions. that even where a sale of land is made in bulk or gross, and not by the acre, that an unusual shortage in acreage, meaning such a shortage as would entitle the grantee to relief in equity on the grounds of mutual mistake, or mistake upon the part of one party and fraud upon the part of the other, or such a shortage as would shock the conscience of a court of equity. In either event the rule

proceeds upon the theory that there was a fraud in fact or a fraud in law, and for either, the grantee could recover the entire amount of deficiency in acreage.

We are of the opinion that by a preponderance of the evidence the actual number of acres of the timber on the two tracts in question was 713, as found by the Chancellor. The deed conveying the timber described it as being all the timber on the lands described in the deed, supposed to contain about 1,000 acres, more or less. There being but 713 acres of the timber, this would leave a deficiency of 287 acres, as found by the Chancellor. But when the deed is examined we do not find that it purports to convey 1,000 acres, or about 1,000 acres, more or less, but it purports to convey all the timber on the lands described, and the lands described purports to contain 1,000 acres, more or less. Hence, it is only by inference that the deed even undertook to convey timber amounting to about 1,000 acres, more or less, and this inference is only to be found from the boundaries of the timber, referring to being bound by certain cleared lands of complainant. The two tracts of land on which the timber is located contains more than a 1,000 acres, although there are only 713 acres of the land that was in timber at the time of the sale.

We have numerous cases in this State where a shortage of land sold in gross and not by the acre is made the subject of the litigation. Among the earlier cases on the subject is that of Adams v. Brown, 4 Baxt., 124. In that case it appears that a tract containing 200 acres, more or less, was found to contain only 150 acres, or a deficiency of one-fourth or twenty-five per cent. In that case the court said on this subject:

"The next objection, that there is a deficit in the quantity of land, is equally untenable. The land was not sold by the acre, the boundaries were shown to the defendant, and it was estimated in the deed to Brown, as in the deed to Adams, to contain 'two hundred acres, more or less.' "

In that case it appeared that there was some evidence tending to show that the grantor pointed out certain timber land to the purchaser containing about fifty acres lying across a creek from the land sold as being a part of the tract which he was selling, but which did not belong to the tract and was not included within the boundaries, but the court held that this evidence was not reliable for the reasons stated in the opinion, and that there was no actual fraud by the seller, and that the deed made the conveyance in gross and not by the acre. In that case it also appeared that the purchaser went over the land and was given opportunity to see the land and judge for himself the quantity. In the present case the defendants were on this tract of timber for about five hours and rode over the major portion of it on horseback, and the lines and corners were pointed

out by the agent of complainant and by the negro who had been familiar with the lines for many years. There is no remote evidence tending to establish fraud upon the part of complainant to induce the defendants to make the purchase. We do not find any positive evidence in the record to show that complainant, Shaw, made any guarantee, or any representation amounting to a guarantee, that there were 1,000 acres of the timber. The defendant, Law, testified on that subject, and was asked and answered as follows:

"Q. Did Mr. Shaw at any time guarantee that there was 1,000 acres of land? A. Mr. Shaw did not at any time ever quote it as being anything else except 1,000 acres.

"Q. My question is did Mr. Shaw at any time guarantee it as 1,000 acres? A. He said it was 1,000 acres, I suppose he guaranteed it."

Again the witness was asked and answered:

"Q. If I understand you, you have repeatedly stated that Mr. Shaw and Mr. Chamberlain guaranteed that there were 1,000 acres in this tract. A. Yes, they said there was."

When this evidence is analyzed we find no positive statement that Mr. Shaw ever guaranteed any special number of acres, at most it was merely a statement made by Mr. Shaw expressive of his opinion as to the number of acres. The complainant denied that he made any statement to the effect that the tract contained 1,000 acres of timber, and stated that he did not know how many acres of timber there was. Mr. W. T. Davis, Jr., corroborates Mr. Shaw, and testified that he heard Mr. Shaw tell Mr. Osteen that he did not know how many acres of timber there was in the tract, that he had cleared a lot of the land. Both Law and Waldrop admit that they never requested Shaw to have a survey made of the timber. Mr. Chamberlain, the agent of Mr. Shaw, and who showed the defendants the land, testified that Shaw never agreed to have the survey made. Mr. Shaw testified to the same thing. Chamberlain also testified that neither he nor Shaw guaranteed that there were 1,000 acres of timber in the tract. This evidence, taken in connection with the recitation in the timber deed, which states, "supposed to contain about 1,000 acres, more or less," clearly indicates that Shaw did not know the exact number of acres, and this recitation in the deed was notice to the defendants that no specific number of acres of timber was conveyed by the deed.

One of the latest cases by the Supreme Court of this State involving this question is the case of Smith v. Grizzard, decided at the December Term, 1923, 149 Tenn., 207. In that case it appeared that it was a sale in gross of land, and that the vendee had been on the land twice, and had the lines of the land pointed out to him. There was a deficiency of approximately thirty acres, of fifteen per cent,

and the Chancellor decreed in favor of complainant an abatement of the purchase price for the value of the thirty acres. In reversing the decree of the Chancellor and dismissing the bill, the Supreme Court stated that the Chancellor followed the holding in the case of Bingham v. Madison, 103 Tenn., 358, and discussed the Bingham case, and distinguished it from the case of Waters v. Hutton, 85 Tenn., 116, and of Rich v. Scales, 116 Tenn., 65, and pointed out that in Bingham v. Madison, that the title to about one-half of a small tract of land failed, being the most valuable half, and that an extreme case on the facts was therefore presented. The court further pointed out that in the Bingham v. Madison case the identical land that he intended to buy, or that the vendor intended to sell, he did not get. In Smith v. Grizzard it is said by the court:

"In the present case the court, having reviewed all the facts, finds clearly that there was no fraud, and any possible presumption of fraud is thereby affirmatively rebutted. Therefore the question presented is, whether or not, without fraud, proven or presumptive, abatement should be granted to the purchaser on the acreage basis, the deficiency being hardly fifteen per cent, when it is clear that the sale was in gross, expressly not by the acre and made under all the conditions hereinbefore detailed. We are of the opinion that complainant is not entitled to recover on this state of facts found by the Chancellor. In this case there was no mistake as to the boundaries, and there was no failure of title to any portion of the lands pointed out, in which classes of cases the doctrine of innocent and mutual mistake has been applied, and not to cases where the mistake was merely an erroneous estimate by one or both parties the extent in acreage of an area so located and of such limited size as to be plainly viewed, and which had been carefully examined."

In that case the court further states that the conclusion reached is amply supported by the holdings in Adams v. Brown, supra, Rich v. Scales, supra, Waters v. Hutton, supra, and Young v. Weakley, 144 Tenn., 360.

In the case of Waters v. Hutton, supra, the shortage in acreage was due to the fact that a portion of the land conveyed was in the adverse possession of another at the time of the conveyance. The court in that case said:

". . . That a party has a right to stand upon his contract and claim the benefit of all that it gives, both in law and in equity, is undoubtedly the general rule. Can this complainant recover the value of the lost land included in his contract? We think not. He could not do so at law, because of the champertous character of the sale. He can come into a court of equity

only upon the equitable ground that he ought to have compensation for the lost land because the sale was to that extent void. Coming into a court of equity for equitable relief, he must do equity. He ought not to recover that which in good conscience he cannot ask. He has gotten all that he understood he was buying; all that the defendants understood they were selling. The land which he failed to get was not estimated by either buyer or seller in fixing the value. He gets a less number of acres than he expected, but his deed conveys him 307 acres, more or less, and the loss is not such as to prove fraud. The sale being by the gross, and not by the acre, he is entitled to no relief upon this account. The case is one of a purchase of a tract of land in the gross, after a personal examination by the vendee, who has gotten all that he wishes or intended to buy, or that the vendor intended to sell. To use the language of this court in a similar case: 'In such a case a purchaser should never present himself in a court of equity for relief.' Noone who has the precise thing expected and intended to be purchased, can have, in a court of equity an abatement in the price."

In the Waters v. Hutton case the deed conveyed 307 acres, more or less, and the deficiency was sixty-four acres, or about twenty-one per cent.

In the case of Rich v. Scales, supra, under the first and second headnotes, it is said:

"2. Where the sale is in gross, no compensation will be granted for either an excess or a deficiency, but if the deed recites the number of acres and it subsequently develops that there is an excess or deficiency so great as to justify an inference of fraud, or of mistake equivalent in its effect to fraud, relief will be granted."

"3. Same. If the vendee has inspected the land and obtained the very tract he intended to buy and all the vendor intended to sell, he can have no relief, although the deed purports to state the number of acres, unless the difference between the number stated and the actual number of acres contained be so great as to shock the conscience of the court, when relief will be granted on the ground of fraud."

The opinion in Rich v. Scales, makes the following reference to the case of Bingham v. Madison, supra:

"It is insisted that the case of Bingham v. Madison, supra, fully sustains complainants contention. This is an erroneous view. In that case the deed purported to pass title to twenty-five acres of land which it described. The location of the supposed lines was pointed out; but both the vendor and the vendee were mistaken as to the true location. It subsequently developed

that one-half of the land covered by the calls was held by a superior title. It did not appear that there was any adverse possession of any part of the land at the time the conveyance was executed, either known to the vendee or existing in fact. It turned out that the vendee did not obtain the land he intended to buy and which the vendor intended to sell. Upon this State of facts the vendee was rightly granted a decision. That was a very different case from the one now before the court.

In the present case, as hereinbefore pointed out, the timber deed did not in specific terms undertake to mention even the approximate number of acres of timber, but described it as being all the merchantable timber, except the cypress, on the lands of complainant supposed to contain about 1,000 acres, more or less, and the description of the lands was by bounds and not by metes. It was not a sale of the land, but merely the merchantable timber on the land. It was known that a part of the land was cleared and in cultivation at the time the sale was made. As above pointed out there were more than 1,000 acres of the land, but only 787 acres of the land was in timber. The defendants offered oral testimony to support the contention that it was a sale by the acre of the timber, and that complainant agreed to have the lands surveyed and the number of acres in timber determined, and guaranteed that there was 1,000 acres of the land in timber. This evidence was objected to by complainant as set forth under certain of the assignments of error of complainant. We think this evidence was competent for the purpose offered. However, where the oral evidence tended to contradict the statements contained in the deed, or sought to have a different interpretation placed upon the language contained in the deed than that expressed in the deed, the evidence must be clear, cogent and convincing. The complainant and certain of his witnesses very emphatically denied that any such agreements were made. But in the view of the case we have taken, that is, that this was a sale of the timber in gross and not by the acre, as shown by a preponderance of the evidence, it does not become material or necessary to pass upon and decide the competency of this evidence.

As to whether there is a recognized distinction or a different rule applying to the sale of timber from that which applies to the sale of land where both sales are in gross and not by the acre, we do not find that this question has been before the Supreme Court of this State. Appellant has cited in the brief two Virginia cases which recognized a distinction, and the application of a different rule. In the case of Elam v. Ford, by the Virginia court, reported in 134 S. E., page 670, it was said:

"While these principles have been applied frequently by this court in cases where there was a mistake as to the quantity in

the sale of land, and the acreage influenced the price at which the land was purchased, we can find no case, and none has been cited, in which they have been applied to the sale of standing timber.''

That was a case in which there was a claim of a deficiency in the number of acres of timber land. Again in the case of Shoemaker v. Cake, 83 Va. 4, 1 S. E., 387, and in which it appeared that the timber on 400 acres had been sold, but it turned out that only 218 acres was contained in the tract, it was said by the court, referring to the rule allowing an abatement for deficiency in land:

"But these principles (governing the measure of compensation in case of mistake as to quantity in the sale of lands) have no application to a case like this. There is no sale of any quantity of land. The sale is of a lot of timber.''

In the absence of a contrary holding by the Supreme Court of this State, we are inclined to adopt the reasoning and the rule in the two Virginia cases referred to. We have been unable to find, nor have we been cited, any case where the same rule is applied in the sale of a body of timber and where the land is not sold, which applies to a sale in gross of land. Under all the facts and circumstances surrounding this transaction, we cannot escape the conclusion that defendants knew with reasonable accuracy the body of timber they were buying from complainant. They went onto the lands and spent several hours riding through the timber. The land lines were pointed out to them. They went over the major portion of the land, and they were evidently satisfied from what they saw from a personal inspection and from their experience as timber men, to make the purchase. They made the cash payment and all deferred payments except the last note without question. They never complained of any shortage in acreage, nor does it appear that there was less timber in stumpage than they estimated or figured on the track. To the contrary, there is evidence in the record to the effect that their anticipations as to the number of feet of timber on the land were fully met if not exceeded. When the original bill was filed, there was a consent decree for the appointment of a receiver, and by specific terms this consent decree recognized the right of complainant to receive the full amount of the note sued on with the accrued interest and the attorneys fees, from the lumber and logs then in possession of the defendants and turned over to the receiver. At no subsequent time was there any request or application made for a modification or an alteration of the consent decree with reference to paying to complainant the full amount of the note, accrued interest and attorneys fees sued on. The conclusion we reach is that this was a sale of a body of timber in gross and for which the defendants contracted and agreed to pay a sum in gross; that there

was no fraud either in law or in fact, or any facts from which fraud could be implied, on the part of complainant, and that the defendants are not entitled to have any abatement made, or any credit on the note sued on, or any recovery against complainant on account of the alleged shortage in the acreage of timber sold to them by complainant.

In this view of the case it is unnecessary to discuss the other assignments of error made by complainant, or the assignments of error filed by the defendants, since the foregoing conclusions dispose of all assignments of error made by both the complainant and the defendants, except the item of the date of the $175 credit to be entered on the note sued on. This credit should be entered as of the date of its payment, which appears to have been on the ———— day of ————, 1925, the exact date not appearing, other than it was made in the year 1925.

We are also of the opinion that the learned Chancellor was in error in adjudging any part of the costs of the cause against complainant, and that all of the costs of the cause should be adjudged against the defendants.

It results that the decree of the Chancellor allowing the abatement in favor of the defendants on account of the alleged deficiency in acreage, of 187 acres at $25 per acre, or any amount of abatement on account of the deficiency in the acreage of the land, is reversed; and the decree of the Chancellor in taxing any part of the costs of the cause against the complainant and sureties on the prosecution bond is also reversed. The cause is remanded to the chancery court of Haywood county for the enforcement of a judgment in favor of the complainant and against the defendants for the amount of the note sued on, with interest from the date of the same, plus the attorneys fees as provided in the note, less the $175 credit, to be entered on said note as of the date of the payment of the same, and said date may be determined by a reference to the Master, unless the same is made the subject of a consent order. The defendants, J. B. Osteen, T. J. Waldrop, and J. L. Law, and sureties on their appeal bond, will pay the costs of this appeal.

Owen, J., and J. E. Holmes, Sp. J., concur.